**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

EDWARD LOUIE, Individually and on Behalf of All Others Similarly Situated,

    Plaintiff,

v.

THE WHITEWAVE FOODS COMPANY,
GREGG L. ENGLES,
JOSEPH S. HARDIN, JR.,
STEPHEN L. GREEN,
DOREEN A. WRIGHT,
MICHELLE GOOLSBY,
W. ANTHONY VERNON,
ANTHONY J. MAGRO,
DANONE S.A., and
JULY MERGER SUB INC.,

    Defendants.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS AND JURY TRIAL DEMAND**

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.    This action stems from a proposed transaction announced on July 7, 2016 (the "Proposed Transaction"), pursuant to which The WhiteWave Foods Company ("WhiteWave" or

the "Company") will be acquired by Danone S.A. and its wholly-owned subsidiary, July Merger Sub Inc. ("Merger Sub," and together with Danone S.A., "Danone").

2. On July 6, 2016, WhiteWave's Board of Directors (the "Board" or "Individual Defendants") caused WhiteWave to enter into an agreement and plan of merger (the "Merger Agreement"). Pursuant to the terms of the Merger Agreement, stockholders of WhiteWave will receive $56.25 per share in cash.

3. On July 29, 2016, defendants issued materially incomplete and misleading disclosures in the Preliminary Proxy Statement (the "Proxy") filed with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction. The Proxy is deficient and misleading in that it fails to provide adequate disclosure of all material information related to the Proposed Transaction.

4. Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

**PARTIES**

8.   Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of WhiteWave common stock.

9.   Defendant WhiteWave is a Delaware corporation and maintains its principal executive offices at 1225 Seventeenth Street, Suite 1000, Denver, Colorado. WhiteWave's common stock is traded on the NYSE under the ticker symbol "WWAV."

10.   Defendant Gregg L. Engles ("Engles") has served as Chairman of the Board and Chief Executive Officer ("CEO") of the Company since August 2012.

11.   Defendant Joseph S. Hardin, Jr. ("Hardin") has served as a director of the Company since August 2012.

12.   Defendant Stephen L. Green ("Green") has served as a director of the Company since August 2012.

13.   Defendant Doreen A. Wright ("Wright") has served as a director of the Company since August 2012.

14.   Defendant Michelle Goolsby ("Goolsby") has served as a director of the Company since November 2012.

15.   Defendant W. Anthony (Tony) Vernon ("Vernon") has served as a director of the Company since January 2016.

16.   Defendant Anthony J. Magro ("Magro") has served as a director of the Company since January 2016.

17.   The defendants identified in paragraphs 10 through 16 are collectively referred to herein as the "Individual Defendants."

18.   Defendant Danone S.A. is a *société anonyme* organized under the laws of France.

19. Defendant Merger Sub is a Delaware corporation and a wholly-owned subsidiary of Danone S.A.

## CLASS ACTION ALLEGATIONS

20. Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of WhiteWave (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

21. This action is properly maintainable as a class action.

22. The Class is so numerous that joinder of all members is impracticable. As of April 30, 2016, there were approximately 176,918,229 shares of WhiteWave common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

23. Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

24. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

25. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be

dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

26. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

*Background of the Company*

27. WhiteWave is a leading consumer packaged food and beverage company that manufactures, markets, and sells branded plant-based foods and beverages, coffee creamers and beverages, premium dairy products, and organic produce.

28. The Company sells products primarily in North America, Europe, and through a joint venture in China.

29. WhiteWave is focused on providing consumers with innovative food and beverage choices that meet their increasing desires for nutritious, flavorful, convenient, and responsibly-produced products.

30. The Company's widely-recognized, leading brands distributed in North America include Silk®, So Delicious® and Vega™ plant-based foods and beverages, International Delight® and LAND O LAKES®* coffee creamers and beverages, Horizon Organic® and Wallaby Organic® premium dairy products, and Earthbound Farm® organic salads, fruits and vegetables. Its popular plant-based foods and beverages brands in Europe include Alpro® and Provamel®.

31.     On May 10, 2016, WhiteWave issued a press release wherein it reported its "record" first quarter 2016 results. Total net sales increased 14% and constant currency net sales increased 15% in the first quarter. Organic constant currency net sales increased 8%, adjusted total operating income increased 21%, reflecting continued operating margin expansion, and adjusted diluted earnings per share increased 17%. The Company reported that it is increasing its full year 2016 adjusted diluted earnings per share guidance and reiterating high single-digit organic constant currency net sales growth for full year 2016.

*Flawed Process Leading Up to the Proposed Transaction*

32.     The Proposed Transaction is the result of a flawed process.

33.     On September 9, 2015, Individual Defendant Engles and Edward F. Fugger ("Fugger"), Executive Vice President, Strategy & Corporate Development of WhiteWave, attended a presentation by Danone at an industry conference. Afterwards, Engles spoke with Emmanuel Faber ("Faber"), Danone's CEO, and set up a meeting, which took place in Paris on January 14, 2016. At this meeting, Engles raised the possibility of a strategic transaction between the two companies. That same day, an investment banker from Lazard Frères SAS, which together with Lazard Frères & Co. LLC (together, "Lazard") was acting as Danone's financial advisor, met with Fugger to discuss a potential small acquisition opportunity for WhiteWave unrelated to Danone. In the course of that discussion, the investment banker and Fugger discussed Fugger's potentially meeting the new Chief Financial Officer of Danone, Cécile Cabanis ("Cabanis").

34.     In early February 2016, a media report identified activist interest in, and speculated regarding a possible takeover of, WhiteWave.

35. On February 10, 2016, Fugger e-mailed Cabanis to set up a meeting, which was held on March 8, 2016 in New York City. The Proxy is silent as to whether the WhiteWave Board was aware or authorized this meeting, or if it was initiated solely by Fugger. During the meeting, Cabanis expressed Danone's interest in discussing potential opportunities between the two companies, but emphasized that Danone would only be interested in participating if the process did not involve multiple parties but was conducted solely with Danone.

36. During a Board meeting held on March 10 and 11, 2016, Engles finally mentioned the conversations with Faber and Cabanis, as well as certain stockholder interactions, though the Proxy is silent as to the nature of such interactions, including who they were with. The Board subsequently authorized management to engage in further discussions with Danone to ascertain Danone's interest in making a proposal for a transaction with the Company.

37. On March 31, 2016, Fugger and Cabanis spoke, and Cabanis informed Fugger that Faber planned to contact Engles in early April to discuss the possibility of strategic transactions between WhiteWave and Danone.

38. On April 6, 2016, Faber contacted Engles and informed him that Danone was interested in exploring a potential business combination transaction with WhiteWave, and that Danone's preference was an acquisition of WhiteWave for cash.

39. Fugger and Cabanis engaged in further discussions through the end of April 2016. Cabanis continually noted that Danone would not be willing to engage in a process involving multiple parties. The Proxy discloses no pushback or objection by Fugger to this exclusivity request.

40. The Board met on May 11, 2016 and considered process alternatives and whether to contact additional parties. The Board ultimately decided *not* to contact any additional parties.

41. On May 23, 2016, the WhiteWave Board held a telephonic meeting, during which the Board determined not to conduct a market check.

42. On May 24, 2016, Fugger sent Cabanis a draft non-disclosure agreement.

43. On June 24, 2016, Cabanis advised Fugger that Danone would deliver a written proposal to acquire WhiteWave for $53.00 per share in cash.

44. On June 28, 2016, representatives of WhiteWave and Danone, including Engles and Faber, met. During this meeting, WhiteWave and Danone negotiated, in a single day, final merger consideration of $56.25 per share. During these discussions, Faber invited Engles to join Danone's board of directors following completion of the merger, and Engles indicated he would do so.

45. On July 6, 2016, the WhiteWave Board met and approved the Proposed Transaction.

*The Merger Agreement*

46. The Board caused the Company to enter into the Merger Agreement, pursuant to which WhiteWave will be acquired for inadequate consideration.

47. The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals. Section 6.3(a) of the Merger Agreement states:

> (a) Except as expressly permitted by this Section 6.3, the Company shall and shall cause each of its Affiliates and its and their respective officers and directors and shall use reasonable best efforts to cause its and their other employees, agents, financial advisors, investment bankers, attorneys, accountants and other

8

representatives (collectively, with its directors and officers "Representatives"): (i) to immediately cease and cause to be terminated any solicitation, encouragement, discussions or negotiations with any persons (other than Parent) that may be ongoing with respect to a Company Takeover Proposal and (ii) not to, directly or indirectly, (A) solicit, initiate, knowingly encourage or knowingly facilitate any inquiries regarding, or the making of any proposal or offer that constitutes, or could reasonably be expected to lead to, a Company Takeover Proposal, (B) engage in, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any other person any information in connection with or for the purpose of soliciting, initiating, knowingly encouraging or knowingly facilitating, a Company Takeover Proposal (other than (x) solely in response to an unsolicited inquiry, to refer the inquiring person to this Section 6.3 and to limit its communication exclusively to such referral or (y) upon receipt of a *bona fide*, unsolicited written Company Takeover Proposal from any person that did not result from a breach of this Section 6.3, solely to the extent necessary ascertain facts or clarify terms with respect to a Company Takeover Proposal for the Company Board of Directors to be able to have sufficient information to make the determination described in Section 6.3(c)), or (C) approve, adopt, recommend or enter into, or propose to approve, adopt, recommend or enter into, any letter of intent or similar document, agreement, commitment, or agreement in principle (whether written or oral, binding or nonbinding) with respect to a Company Takeover Proposal. The Company shall not, and shall cause its Affiliates not to, release any third party from, or waive, amend or modify any provision of, or grant permission under, or fail to enforce, any confidentiality obligations with respect to a Company Takeover Proposal or similar matter or any standstill provision in any agreement to which the Company or any of its affiliates is a party, in each case, unless the Company Board of Directors determines in good faith, after consultation with its independent financial advisor and outside legal counsel, that the failure to do so would violate its fiduciary duties under applicable Law.

48. Further, the Company must advise Danone, within forty-eight hours, of any proposals or inquiries received from other parties. Section 6.3(d) of the Merger Agreement states:

(d) Without limiting the foregoing, the Company shall as promptly as practicable (and in no event later than within one Business Day (but in no event longer than 48 hours)) after receipt by an executive officer or director of the Company notify Parent in the event that the Company or any of its Representatives receives a Company Takeover Proposal or a request for information relating to the Company or its Subsidiaries that constitutes or would reasonably be expected to result in or that contemplates a Company Takeover Proposal, including the identity of the person making the Company Takeover Proposal and the material terms and conditions thereof (including an unredacted copy of such Company Takeover

>  Proposal or, where such Company Takeover Proposal is not in writing, a description of the terms and conditions thereof). The Company shall keep Parent reasonably informed, on a reasonably current basis, as to the status of (including any developments, discussions or negotiations) such Company Takeover Proposal (including by as promptly as practicable (and in no event later than one Business Day (but in no event longer than 48 hours) after receipt by an executive officer or director of the Company) providing to Parent copies of any correspondence, proposals, indications of interest or draft agreements relating to such Company Takeover Proposal). The Company agrees that it and its Affiliates will not enter into any agreement with any person subsequent to the date of this Agreement which prohibits the Company from providing any information to Parent in accordance with, or otherwise complying with, this Section 6.3(d).

49.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Danone a "matching right" with respect to any "Superior Proposal" made to the Company. Section 6.3(f) of the Merger Agreement provides:

>  (f) Anything to the contrary set forth in this Agreement notwithstanding, after the date of this Agreement and prior to the time that the Company Stockholder Approval is obtained, but not after, the Company Board of Directors may, with respect to a bona fide, unsolicited Company Takeover Proposal that did not result from a breach of this Section 6.3, make an Adverse Recommendation Change or cause the Company to terminate this Agreement in accordance with Section 8.1(g) in order to enter into a definitive agreement relating to such Company Takeover Proposal if and only if, prior to taking either such action, (i) the Company has complied with its obligations under this Section 6.3 and (ii) the Company Board of Directors has determined in good faith, after consultation with its independent financial advisor and outside legal counsel, that such Company Takeover Proposal constitutes a Company Superior Proposal; provided, that prior to making such Adverse Recommendation Change or effecting such termination, (A) the Company has given Parent at least three Business Days' prior notice of its intention to take such action, specifying the reasons therefor, including the terms and conditions of, and the identity of the person making, any such Company Superior Proposal and has contemporaneously provided to Parent a copy of the Company Superior Proposal, a copy of any proposed Company Acquisition Agreements and a copy of any financing commitments relating thereto (or, in each case, if not provided in writing to the Company, a written summary of the terms and conditions thereof), (B) if requested by Parent, the Company shall have negotiated in good faith with Parent and its Representatives during such notice period to enable Parent to propose revisions to the terms of this Agreement such that it would cause such Company Superior Proposal to no longer constitute a Company Superior Proposal, (C) following the end of such notice period, the

> Company Board of Directors shall have considered in good faith any revisions to the terms of this Agreement proposed by Parent, and shall have determined, after consultation with its independent financial advisor and outside legal counsel, that the Company Superior Proposal would nevertheless continue to constitute a Company Superior Proposal if the revisions proposed by Parent were to be given effect and (D) in the event of any change to any of the financial terms (including the form, amount and timing of payment of consideration) or any other material terms of such Company Superior Proposal, the Company shall, in each case, have delivered to Parent an additional notice consistent with that described in clause (A) above of this proviso and a new notice period under clause (C) of this proviso shall commence (except that the three Business Day notice period referred to in clause (A) above of this proviso shall instead be equal to the longer of (x) two Business Days and (y) the period remaining under the notice period under clause (A) of this proviso immediately prior to the delivery of such additional notice under this clause (D)) during which time the Company shall be required to comply with the requirements of this Section 6.3(f) anew with respect to such additional notice, including clauses (A) through (D) above of this proviso. Anything to the contrary contained herein notwithstanding, neither the Company nor any of its Subsidiaries shall enter into any Company Acquisition Agreement unless this Agreement has been terminated in accordance with its terms.

50. Further locking up control of the Company in favor of Danone, the Merger Agreement provides for a "termination fee" of $310 million, payable by the Company to Danone if the Individual Defendants cause the Company to terminate the Merger Agreement.

51. By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

52. Certain of the Company's officers and directors stand to receive significant benefits as a result of the Proposed Transaction. For example, Individual Defendant Engles will serve as a member of the board of the post-transaction company.

53. The consideration to be paid to plaintiff and the Class in the Proposed Transaction is unfair and inadequate because, among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

54.     Further, the merger consideration fails to adequately compensate the Company's stockholders for the significant synergies created by the merger.

55.     Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

*The Materially Incomplete Proxy*

56.     Defendants filed the Proxy with the SEC in connection with the Proposed Transaction. As alleged below and elsewhere herein, the Proxy omits material information that must be disclosed to WhtieWave's stockholders to enable them to render an informed decision with respect to the Proposed Transaction.

57.     The Proxy omits material information with respect to the process and events leading up to the Proposed Transaction, as well as the opinions and analyses of WhiteWave's financial advisor, Goldman Sachs. This omitted information, if disclosed, would significantly alter the total mix of information available to WhiteWave's stockholders.

58.     With respect to WhiteWave's financial projections, the Proxy fails to disclose: (i) the "numerous assumptions" used by management; (ii) the potential future adjustments for 2016 in the Company's 2016 forecasts; (iii) the selected measures of the Company's Forecasts through 2018 that were provided to Danone in May 2016 and to Goldman Sachs for use in rendering its fairness opinion and extrapolated to 2026 and utilized by Goldman Sachs; (iv) the projection for GAAP measure net income that was utilized, relied on, and reflected in the Forecasts; (v) the adjustments to adjusted EBIT and adjusted EBITDA, including projected stock-based compensation expenses, SAP transition costs in the Company's Fresh Foods business, grants in connection with the Company's initial public offering and other non-cash stock-based

compensation costs, mark-to-market adjustments on hedging transactions, and costs to manage and losses incurred on the investment related to the Company's China joint venture with Mengniu; and (vi) the Company's projected capital expenditures and changes in net working capital accounts, utilized to create the unlevered free cash flows.

59. With respect to Goldman Sachs' Illustrative Discounted Cash Flow Analysis, the Proxy fails to: (i) identify, quantify, and source of the weighted average cost of capital ("WACC") assumptions utilized; (ii) disclose the basis for utilizing discount rates 7.5% to 9.5%; and (iii) disclose whether the perpetuity growth rates correspond to assumed terminal pricing multiples.

60. With respect to Goldman Sachs' Illustrative Present Value of Future Share Price Analysis, the Proxy fails to disclose: (i) the basis for excluding future values beyond 2018; (ii) the means by which Goldman Sachs arrived at an illustrative discount rate of 10.0%; and (iii) the manner in which cost of equity was calculated.

61. With respect to Goldman Sachs' Selected Transactions Analysis, the Proxy fails to disclose: (i) the observed transaction-by-transaction enterprise values; (ii) financial metrics; and (iii) other multiples and/or transaction premiums examined.

62. The Proxy fails to disclose Goldman Sachs' services previously performed for the Company or Danone, or any affiliates, as well as the amount of compensation received for such services.

63. The Proxy fails to disclose the stockholder interactions Engles disclosed he had during the March 10-11, 2016 Board meeting, including the identity of the stockholder(s) and details regarding the interactions.

## COUNT I

### Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and WhiteWave

64.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

65.     The Individual Defendants disseminated the false and misleading Proxy, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  WhiteWave is liable as the issuer of these statements.

66.     The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy.

67.     The Individual Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

68.     The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to stockholders.

69.     The Proxy is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

70.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

71.     Because of the false and misleading statements in the Proxy, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Danone

72.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

73.     The Individual Defendants and Danone acted as controlling persons of WhiteWave within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of WhiteWave and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

74.     Each of the Individual Defendants and Danone was provided with or had unlimited access to copies of the Proxy alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

75.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Proxy contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.  They were thus directly in the making of the Proxy.

76. Danone also had direct supervisory control over the composition of the Proxy and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy.

77. By virtue of the foregoing, the Individual Defendants and Danone violated Section 20(a) of the 1934 Act.

78. As set forth above, the Individual Defendants and Danone had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Directing the Individual Defendants to disseminate a Proxy that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E. Awarding plaintiff the costs of this action, including reasonable allowance for

plaintiff's attorneys' and experts' fees; and

  F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

DATE: August 23, 2016

              Respectfully submitted,
              */s/ Rusty E. Glenn*
              Rusty E. Glenn
              **THE SHUMAN LAW FIRM**
              600 17th Street, Suite 2800 South
              Denver, CO 80202
              Telephone: (303) 861-3003
              Facsimile: (303) 536-7849
              Email: rusty@shumanlawfirm.com

              Kip B. Shuman
              **THE SHUMAN LAW FIRM**
              Post-Montgomery Ctr.
              One Montgomery Street, Ste. 1800
              San Francisco, CA 94104
              Telephone: (303) 861-3003
              Facsimile: (303) 536-7849
              Email: kip@shumanlawfirm.com

              *Local Counsel for Plaintiff*

              **RIGRODSKY & LONG, P.A.**
              Seth D. Rigrodsky
              Brian D. Long
              Gina M. Serra
              Jeremy J. Riley
              2 Righter Parkway, Suite 120
              Wilmington, DE 19803
              (302) 295-5310

              **RYAN & MANISKAS, LLP**
              Katharine M. Ryan
              Richard A. Maniskas
              995 Old Eagle School Road, Suite 311
              Wayne, PA 19087
              (484) 588-5516

*Counsel for Plaintiff*

# CERTIFICATION

I, _Edward Louie_, ("Plaintiff") declare, as to the claims asserted under the federal securities laws that

1. Plaintiff has reviewed the complaint and authorizes its filing.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition or trial, if necessary. I understand that is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4. Plaintiff's purchase and sale transaction(s) in the **The WhiteWave Foods Company (NYSE: WWAV)** security that is the subject of this action during the Class Period is/are as follows:

**PURCHASERS**

| Buy Date | Shares | Price per Share |
|---|---|---|
| 2/25/15 | 300 | 40.87 |
| | | |
| | | |
| | | |
| | | |

**SALES**

| Sell Date | Shares | Price per Share |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

5. Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including Plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6. During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws, except as described below_____.

7. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _15th_ day of _August_, 2016.

_Edward Louie_
Signature

1672 Howard Ave
Address

San Carlos, Ca. 94070
City, State, Zip

CORKYWHALE at yahoo.com
Email

_Edward Louie_
Print Name

650-776 1434
Phone Number

No
Current or Former Employee (Yes or No)

yes
Did you own shares prior to the Class Period?